Graham, Judge,
dissenting:
While approving of that portion of the opinion which finds two breaches of the contract by the defendant and the amount allowed therefor, I dissent from the other findings and conclusions of the court. I think the findings do not conform with the proof in the following particulars:
First. In not finding that the defendant was .without authority under the contract to turn the water into the canal as it did.
Second. In not finding that at the time the water was turned into the canal the plaintiffs was entitled to at least 9 months, and probably 14 months, from March 1, 1908, additional time within which to complete the contract, being the amount of the extensions of time eventually granted and conceded by the Secretaries of the Interior to be the right of the plaintiffs.
Third. In not finding that the defendant was guilty of misrepresentation in furnishing misleading estimates, which were not based upon the survey shown the plaintiffs, or any survey whatever.
Fourth. In finding that the plaintiffs had notice of the character of the change in the volume and character of the work by reason of the relocation of the line of the canal, and *194 thereafter went on with the work; and in not finding that they were without notice of this change and that the notice could not have been giren them at the time that it is claimed that it was for the reason that the relocation survey was not cross sectioned in advance, but only cross sectioned as the work progressed, and the real facts could not have been ascertained by them, and were not definitely known by the defendant itself.
Fifth. In finding that the Secretary of the Interior had authority under section 25 of the contract to change the location and quantities of material; and in not finding that he had no right under the circumstances of the case to change the location, and that, in any event, he was' precluded from doing so by the wrongful misrepresentations in the estimates, and the furnishing of estimates not based upon any survey, and not based upon the survey shown to the plaintiffs as bidders.
Before proceeding to the discussion of this case I wish to point out that the opinion of the court finds two distinct breaches of this contract by the defendant, both arbitrary and inexcusable.
First. The breach of the contract by turning water into the canal when the plaintiffs’ work, including the additional 70 per cent put on him by the relocation, was 97^ per cent completed, and when the plaintiffs, by the admission of the Secretaries of the Interior, were entitled to nine months’ extension of time by reason of the increase in volume and change in the character of the work.
Second. The breach by abrobation of the contract and seizing the plaintiffs’ property, the court finds was the act of the Acting Secretary of. the Interior based upon information given by officers in the field which was not accurate, and upon facts that did not actually exist, and that the Acting Secretary made no effort to acquaint himself with the true facts of the case.
An examination of the conduct of the representatives of the Government in breaching the contract in these two instances is entirely in keeping with their conduct from the inception of this matter and is characteristic of their whole treatment of the plaintiffs in this case from the time they *195 induced them to enter into this contract by misrepresentation of estimates and survey, on through the unfair and arbitrary change of location and increase of the quantity of work, and the erroneous and prejudiced classification of the work while it was in progress.
Attention is also called to the fact that the officials who were primarily to blame for these two breaches were in the one case, Supervising Engineer Boss, who ordered the misleading estimates to be prepared, and the wrongful change of location; and in the other case, Engineer Fisher, who made the erroneous classification. The latter who, in effect,. did all of the classifying, furnished the facts upon which the contract was abrogated, which, as stated above, the court finds to have been untrue.
The conduct of the chief engineer, acting for the Secretary of the Interior and the higher officials, as pictured by the majority opinion in abrogating this contract without making an effort to become acquainted. with the facts, is characteristic of their conduct throughout this whole transaction.
An examination will also show that the two breaches found in the opinion were due primarily, and logically go back to the misrepresentation which inhered in the letting of this contract and the wrongful change of location, in that these two acts of the defendant increased the volume of work 70 per cent, changed its character, and thereby prevented the plaintiffs from completing their contract by the 1st of March, the time fixed in the contract for its completion. It is indisputable that at the rate the plaintiffs did their work they would have completed the yardage called for in the specifications of the contract before that time. Had they completed their contract there would have been no opportunity or occasion for the defendant to breach it by turning in the water or to breach it by abrogating it. So that the conclusions of the -court of necessity go back to and are based upon, and inevitably grow out of, the misrepresentations and wrongful acts which inhered in the original letting of this contract, and the increase in the volume of work by the change in the location and character of the work. The letter of Secretary *196 Garfield granting an extension of the 20th of June, 1908, and of Secretary Ballinger granting an extension from June 20, 1908,. to October 20, 1908, as well as the report to each of them by the chief engineer, show clearly that the moving cause for these extensions was the unreasonable increase in the amount of work — 70 per cent, as stated — by the change of location and the original misleading estimates in the specifications^
This seems a proper place to give the opinion of the Secretary and the chief engineer of what happened in this case, and what were the real causes of this litigation. It might be well to state that at the time the water was turned into this canal and the plaintiffs stopped work in April, 1908, 97|~ per cent of the work, including the additional 70 per cent not called for by the estimates, had been completed, and a request by the plaintiffs for an extension of time was then before Secretary Garfield. Secretary Garfield, in May, 1908, when he granted this extension of time, had before him a report of the chief engineer which inter alia contained the following:
“ Errors in the specifications entailed upon the contractors the necessity of performing more than seventy per cent more work than was contemplated by the United States and the contractors at the time the contract was executed.”
Secretary Garfield, in his letter of May 22, 1908, to the auditor, says:
“ In further explanation of this situation it is stated that the excess quantities of work actually required oyer those stated in the specifications and schedules were mainly due. to errors in the preparation of the specifications. These errors were made by the United States and the contractors were justified in accepting the figures of the United States as-being at least approximately correct. The excess quantities required to be moved under schedules two and three approximate a total of seventy per cent over and above the quantities cited in the specifications. This is an increase over the quantities estimated to an extent which can not be held to be a reasonable one, and the discrepancy in the figures being chargeable to the United State's it is therefore apparent that the contractors are entitled to an extension of time for moving these excess quantities.”
“ * * * In addition to the above cause of delay, changes in the plan of the canal have greatly increased the quantity *197 of overhaul and changed the character of the work in such a way as to require the contractors to secure additional equipment which resulted in further delay.”
A year after this the chief engineer again reports to Secretary Ballinger:
“ These delays have resulted from the acts of the United States; first, in requiring an amount of work approximately double that covered by the agreement as signed.”
And Secretary Ballinger in his letter of June 5, 1909, to the auditor, alluded to in the opinion of the court, states:
“At the time of the final completion of the work the gross earnings under the contract amounted to $250,000, representing, therefore, approximately double the amount of work covered by the contract. It is therefore apparent that the amount of extra time to which the contractors are entitled owing to this unusual increase in the quantity of the work, is considerable. In extensions heretofore granted this element has been considered to some extent, but not sufficient to accord the contractors the total amount of time to which it is now apparent they were entitled from this cause.”
And thereupon he granted them 120 days extension of time from the time to which Secretary Garfield had previously extended it.
At this very time, June, 1909, there had been held up since July 1, 1908, the amount due the plaintiffs, whose contract called for monthly settlements, on their work for the month of June, 1908, upon the ground that they were liable for liquidated damages for delay. It is interesting to note that the amount of this estimate was not paid until some time after June, 1912. This wrongful claim for liquidated damages wss set aside by Secretary Ballinger at the time the above-mentioned extension was granted by him, he finding that instead of the contractors being liable for damages for delay they were entitled to an extension of time on account of additional work, as Secretary Garfield had done a year before. This is mentioned as illustrative of the whole conduct of the Government officials in charge of the work at Boise in dealing with the plaintiffs. This breach in failing to pay this estimate would alone have been sufficient to have prevented the exercise of the right to cancel the contract upon the ground that the plaintiffs were not progressing satisfac *198 torily with the work, as the Government could not withhold their pay and at the same time require them to proceed with the work.
In order to clearly understand and analyze the situation presented in this case it is necessary to keep constantly and distinctly in view certain salient facts. They are these:
First. That this was a contract for work which required a previous survey and estimates. Prior to the advertising for and letting of the contract the Government had made and had on file in connection with the work but one survey, namely, the original survey of Engineer Smith made during the spring, summer, and fall of 1905. Attached to this survey were cross sections and typical sections. It was the survey the profile maps and plans of which were shown to bidders. The profile of this survey showed the line of the canal to be over a comparatively even surface and the normal cross section showed a balanced can ah The two together unquestionably showed a balanced canal: That is, a canal whose banks could be built from the excavations made in digging it, and, relatively, with the dirt at the point from which it was dug, without much hauling, and that the dirt excavated would be sufficient for the banks without securing additional material from borrow pits outside, and, as stated, without moving the material long distances from the point of excavation. There is no practical dispute about these facts. In any event, the two most competent engineers, Bostaph and Baldwin, men of long experience in all kinds of engineering projects and in irrigation matters, so testified. The qualifications of these men to speak on the subject can not be questioned as far as the record shows. This survey for the two schedules in this contract called for the aggregate handling of 1,339,800 cubic yards of material, for 25,000 cubic yards of stone-work, for 81,248 cubic yards of overhaul, and for 59,039 cubic yards of free haul. These estimates, however, while known to the Government’s engineers, were not disclosed to bidders.
Second. These estimates just given showed that the cost of the construction of the canal would be greater than the funds available for that purpose, and as the law forbid the letting of contracts unless funds were available, it became *199 necessary in order to let this contract within the law to make it appear from the estimates and the advertisement given to bidders that the cost would be within the limit of the available funds. So Engineer Smith was required by Supervising Engineer Boss to three times, and possibly four times, reduce the estimates, until the apparent limit of the available funds was readied. He made three separate estimates, possibly four, and each time was sent back to reduce his estimates. His reductions were made without any reference to the construction of the canal. They were simply haphazard, unscientific, wholesale cuttings down of the estimates to reach a given minimum of volume of work and cost. He says that when they were completed — and showed the estimates upon which this contract was let — that there was only left one bank of the canal, the upper bank having been removed, and that nothing more could have been taken off and left anything that could be called a canal. As a matter of fact, it left a maimed, insufficient, and mutilated affair which, if built, would have been utterly inadequate for the purposes for which it was designed. The engineers in charge would never have dared to construct it, and never intended to construct it in the form in which it was left by Smith after his last reduction.
Third. That no survey, profile, plans, or maps were prepared or ever made for the construction of this mutilated trunk of a canal. The estimates for it were not based upon any plan or survey, although they were represented to bidders to be based upon the above-described original plans and survey of Smith. How misleading this was and what gross misrepresentation it was to give bidders these estimates for a canal with a gross yardage of 583,000 cubic yards, which was the amount the estimates in this contract called for, while the Smith survey called for 1,339,800 cubic yards, can readily be seen, and as fuller details hereafter presented will more fully show.
Fourth. Having secured a bidder for this contract by this misrepresentation as to estimates and survey, and knowing that the canal could not be built according to the’ estimates furnished in the contract and that they would not dare to build it, as it would only have one bank and would be useless, *200 and knowing that if it were built according to the original survey of Smith it would cost two or three times as much as the advertisement showed and the estimates indicated, in addition to putting almost 150 per cent more work upon the innocent contractors, they proceeded to meet the situation which their false estimates had created by a plan and device which it is clear was in contemplation before this contract was let, namely, to entirely change the location and plans of the original Smith survey, with a view to reducing the cost of this survey to something approaching the false estimates and cost shown by the advertisement, specifications, and estimates of the contract let to the plaintiffs. It will be seen that, having let the contract, they were in a position where they had to proceed with the building of the canal. They did not dare to build such a canal as the deformed trunk represented by the contract estimates called for, namely, a canal with one bank. They therefore proceeed, carrying to fruition the original scheme of misrepresentation, to make another survey which would by change of location, lessening the depth of the canal, shortening the canal, increasing the overhaul and free haul, and changing the character of the material to be classified, reduce the volume of work and cost called for by Smith’s survey, and increase the cost to the contractors by changing it from a balanced canal, as called for by the Smith original survey, to a distinctly unbalanced canal, and from a plow and scraper job to a job calling for 1,000 per cent increase in the amount of stonework and a large additional outlay of capital for equipment and other purposes by the contractors ; and this they did. Within a few days after the contract was let they sent an engineer in haste to make this new location and change of plan, and he did make a survey and .location which entirely changed the character, plan, and volume of work to be done, and at the same time reduced the' volume called for under the original survey of Smith and thereby saved expenditure to the Government, but greatly increased the cost and burden of the contractors.
Fifth. Whether the contractors had any notice of this change and survey and whether it was ever intended to give them any notice, I will discuss later. I think that the conclusion is clear that they not only did not receive notice, but *201 it was not intended that they should have notice, and that the matter was so arranged that they could only get notice as the work progressed and after it was done.
It should be pointed out here that when the witnesses for the Government stated that the cost of the canal was reduced by this relocation they refer to the estimates of the original Smith survey. They do not refer to the dummy estimates contained in the contract for the reason that these estimates, as shown above, were based upon no survey, and consequently there could be no comparison.
Sixth. It would seem unnecessary to assert that the contractors had a right to rely upon the good faith and reasonable accuracy of the Government engineers in furnishing the estimates and of the truthfulness and genuineness of the surveys which were shown as related to those estimates, and to rely upon the correctness of the facts which these surveys showed, namely, that it was a balanced canal, that it was a plow and scraper job, and that the overhaul and free haul were comparatively small, as was the stonework, which, of course, requires extra machinery and higher class labor than a plow and scraper job. They had a right also to assume that as the original Smith survey shown them contained a profile with cross sections and typical sections it was a permanent survey, at least approximately so. They had a right to assume that any “final location” or survey would not materially change the character and volume of the work and would only apply to certain minor matters, such as putting in curves, etc., and that when they were told that what was being done was a “ final location ” they had a right to assume these things without further inquiry. They also had a right to assume that the estimates and schedules furnished them were approximately correct and approximately represented the work to be done.
Seventh. Bearing in mind the last statements, let us see what change in the situation was produced by this relocation. The volume and cost of the work was increased approximately 70 per cent. The canal was changed from a balanced canal to an unbalanced canal. It was changed from a plow and scraper job to an increase of 1,000 per cent in the stonework alone. The overhaul was increased from *202 (for the schedules and estimates furnished bidders made no mention of overhaul and an experienced contractor had a right to assume from this that the overhaul was nominal — the same is true of free haul) to 497,688 cubic yards. It was increased from 81,248 cubic yards even in the Smith survey. The free haul between 100 and 200 feet was increased from nominal to 213,704 cubic yards. The depth of the canal was diminished 1 foot, or about 20 per cent, which diminished the amount of excavation, and thereby increased the overhaul, and also increased the cost of stonework at least 15 per cent.
The estimate for stonework in the contract of 6,000 cubic yards, which could readily have been let to local contractors, was increased to 60,000 cubic yards, and the cost of getting it out, as stated above, increased 15 per cent, entailing the purchase of much additional machinery and higher-priced labor and a very much larger outlay of capital and loss to the plaintiffs. It is clearly established by the record and the testimony of competent engineers that a contractor in bidding always pays particular attention to the overhaul, as he usually counts upon losing money upon this. As stated, no mention of overhaul was made in the estimates furnished for this contract and attached to it, and the contractors in making their bid had a right to assume that this would be nominal, whereas they were required by the change of location to remove 497,688 cubic yards. The material in, and character of, the classification was changed by the relocation from that shown in the cross sections and typical sections of the original Smith survey. In the estimates furnished the contractors based upon the one-bank canal reduced by the cutting down of estimates, the plan and scheme had been so mutilated, confused, and disfigured that, as Smith states, the classification was not reliable and was not correct. Presumably from Smith’s testimony, he had made a guess at classification in the matter of making these deformed estimates. The mere statement of the facts as to these vital and material changes in the location and plan shows to a fair mind that something had gone wrong in this matter at the expense of these contractors. This change was deliberately planned and was a part of the original scheme of the Gov- *203 eminent officials, or grew out of their acts of misrepresentation as a method of justifying their previous conduct in letting this contract on unreliable and manufactured estimates. They are what Secretary Garfield calls in his statement “ errors by the United States ” .and “ discrepancies chargeable to the United States.” This is what he says about this transaction two years after the contract had been let and when for the first time he was able to come into possession, through the plaintiffs’ complaint, of the real facts. It is significant as showing how this matter was conducted by the officials at Boise, that he was kept from knowledge of the situation until it was brought to his attention by the repeated protests and personal calls of the plaintiffs. Even as late as three months before he had refused the plaintiffs relief and had “ O. K’d ” the conduct of these men. What he said in his letter of May 22, 1908, to the Auditor when the light finally reached him is quoted above.
The chief engineer seems to have been kept in ignorance of the real facts, although he visited the work, he claims, three times — in the spring, summer, and fall of 1907 — until about the same time, and when he saw the light he stated in May, 1908, to Secretary Garfield, and in June, 1909, to Secretary Ballinger, respectively, as quoted above.
It is proper to call attention here to the fact that when these statements were made in May, 1908, the contract had been breached according to the opinion of the court by turning in the water and stopping the work when only 2-1- per cent of it remained to be performed. This was done with the knowledge of the chief engineer and his approval, and that of Secretary Garfield, to whom as early as March 3, 1908, the plaintiffs had protested against it being done. And although the facts upon which they acted in May were before them in the plaintiffs’ protest of March 3, 1908, they seem to have done what the court says in its opinion was done in the breach, canceling the contract, i. e., made no effort to acquaint themselves with the true facts of the case.
I am convinced that the plaintiffs are entitled to recover in this case upon either or both of the following grounds:
First. That the situation was'misrepresented to him when he was told that his estimates were based upon the original *204 survey of Smith; when he was given “ dummy ” estimates, which were based upon no survey at all, for building a canal which it was not intended should be constructed and which was a mere decoy.
Second. That the contract was breached by the change in the location, which unreasonably, and at great additional cost and loss to the contractors, changed the canal from a balanced to an unbalanced canal, from a plow and scraper job to a greatly increased volume of stonework; increased the overhaul and free haul and the cost of getting out stonework. This was done not only without notice to the contractors, but so as to, in effect, lull them to sleep as to its character and to prevent them, except as the work progressed, from finding out what had happened. As stated, this was accomplished not by cross sectioning this re-location in advance, but by cross sectioning it as the work progressed, making it impossible' for the contractors to find out the general effect of the change upon the character and quantity of work which they would be called upon to do.
If these conclusions be right, there remain only two grounds upon which the defendant can rely to prevent a recovery by the contractors, and the burden of establishing them satisfactorily is on the defendant. They are these :
First. That the contractors had notice of this change, its .character and volume, and by proceeding with the work and accepting pay at the contract prices they waived the breach caused by the change of location.
Second. That under the contract the Secretary of the Interior had a right to change the location.
I will discuss each of these question separately.
As to the first: The plaintiffs were certainly not called upon to employ an engineering force for a month to overhaul this survey and ascertain the facts as to the estimates. It would have taken at least this length of time, as it took Engineer Smith over five months to make the survey and estimates of the seven schedules, of which those in' this case were two.
Aside from this there is no proof of notice to Page of the material and radical change which was made by this relocation. The only notice ‘that he received, so far as the record shows, was a statement by the witness Bond, while *205 making the survey and before it was completed, that he was making a “'final location.” Page had come upon him accidentally while on the work for the purpose of locating his camps and inquired what he was doing and the statement just indicated was Bond’s answer, with the statement that the original line had been departed from at the lower end of the contract. To understand the situation, it must be recalled that the plans and profiles of Smith’s original survey showed a center line with cross sections and typical sections, which ordinarily means and is notice, particularly to an engineer, which Page was, of a relatively permanent location. When under these circumstances he is told that the party is making a “ final location ” it is conceded that it means to an engineer, and he is justified in so concluding, that the changes will only be of a minor character, such as running in curves, etc., and will not involve any material change in the amount or character of the work. In any event, there was no statement by Bond or anyone else which gave him the least notice of the great change in the volume of work, character of classification, and the greatly increased overhaul and free haul, and the decrease in the depth of the canal and the increase in the amount of stonework. As- a matter of fact, they could not have given him this information because they did not have it themselves. This location of Bond’s was not cross sectioned at the time, but the cross sectioning was done as the work progressed. It is interesting to note that not only could Page not have found out from the defendant what this change of location involved, but that when he tried to find out as the work progressed by asking to be allowed to see the cross section notes, they were refused him, and he was not allowed to see them until the local engineer, nearly a year after the work had been begun, was ordered by a board of engineers to permit him to do so. At this time he had completed in volume of work and money paid him, and which was still due him, the greater part of the work which, by the estimates in his contract, he had contracted to perform. Not only did he not have notice of the material changes in this work, but the statement that it was .a “final location,” in the *206 light of the cross sectioning of the original line, did not even put him on inquiry.
But aside from this, which would seem to be conclusive so far as the question of notice to Page is concerned, on the 28th of June, 1907, a little over a year after the work was begun, the plaintiff wrote a letter to the Secretary of the Interior in which he claims that he had at that time completed the amount of work which the schedules and estimates called for, and used the following language:
“ I am not thoroughly familiar with the law or your regulations governing such matters and would therefore respectfully request that I be advised and receive assurance from the proper source as to future payments as to whether or not I should continue on with the work.”
What was the answer to this the record does not show. However, on July 8, 1907, he wrote a very full letter reviewing the whole situation. This was followed by a telegram at some time between July 8 and 16, 1907, to the Secretary of the Interior, which is as follows-:
“ The amount named as the liability for this contract is exceeded under such conditions. Do you authorize me continue, assuring payment as the work progresses ? Am under heavy expense and desire positive answer.”
The chief engineer replied to this as follows:
“ Quantities named in schedule are only approximate. See paragraph twenty-four contract. Payment will be made for all work according to contract.”
Two days later, on July 18, the Acting Director of the Reclamation Service wrote a letter to the plaintiff quoting these two telegrams and stating that the report to the supervising engineer as to the work on his contract showed “ The per cent of work done to the end of June, 1907, 43 per cent; percentage of time elapsed, 62 per cent. According to this the work called for in this contract is less than half done. You appear to be under the impression that quantities called for in your contract have already been exceeded, but this is not in accordance with the engineer’s report on the subject.
“ Your contract calls for the construction of certain portions of the canal and distinctly states that the quantities mentioned therein are only approximate. * * * There is ample provision for extra work also in the contract and *207 you may be assured that whatever work is directed by the engineers will be paid for by the United States in accordance with the provisions of your contract.”
It may be well to state here what is indisputably true, that while Page had performed “ 43 per cent ” of the work including the 70 per cent additional put upon him, he had, in fact, in amount of yardage and compensation therefor, including the yardage for which he had not been paid, at this time performed the amount of work called for by his contract. It is also indisputable that at all times during the progress of the work, he was ahead of time with his work on the basis of his contract estimates; that is, on the basis of these estimates of percentage of the work done — was ahead of the percentage of time consumed. Secretary Ballinger in his letter to the Auditor for the Interior Department of June o, 1909, heretofore mentioned, in reviewing this matter saj's on this point:
“ The quantity of work required of the contractors was practically doubled. The value of the contract based upon quantities given therein was $135,900. At the end of February, 1908, at which time the contract was originally required to be completed, there had been performed by the contractors an amount of work considerably in excess of the total quantity required under the agreement, the gross earnings to that date being approximately $209,000. At the time of the final completion of the work the gross earnings under the contract amounted to $250,000, representing, therefore, approximately double the amount of work covered by the contract.”
The above letter of July 18, the acting director states, was written after reference of these telegrams to him by the Secretary of the Interior. It is very clear from this letter that Page was “under the impression that the quantities called for in your contract had already been exceeded.” It is equally clear that in spite of his protest he was directed to complete the work under the veiled threat of the penalties of the contract. L. P. & J. A. Smith v. United States, 54 C. Cls., 119; affirmed 256 U. S., 11. At this time the chief engineer and the Secretary of the Interior were ignorant of the real facts of the case and of the misrepresentation and the deceptive estimates and the greatly increased volume of the work which the change of location brought about. It is also *208 perfectly clear in the light of their decision, as quoted above, a year later that a very different reply would have been made to this protest had they known the facts. 'As showing the uselessness of protest it might be pointed out here that as late as March, 1908, the Secretary of the Interior and the Chief Engineer Davis, who made the statements above quoted, were still in ignorance of the real state of the case.
The foregoing, to my mind, disposes of the defense here that Page knew or was informed of the change by relocation in the volume and character of the work, and proceeded with the work without protest, thereby waiving his rights.
As to the second ground of defense: It is clear to me that clause 25 of the specifications, which was relied upon as authority for a change by the Secretary of this location, does not apply to and was not intended to apply to a change in location in a case of this kind.
A reading of that clause will show, as appears from several other clauses in the specifications, that this was a standard form of specifications intended to apply particularly to building work and a change in quantities and materials therefor. It is evident from reading the specifications that there was no attempt to alter these standard specifications so as to fit this particular work. Aside from this want of authority to change the location, if the authority existed, it could only be a reasonable change. It could not, as in this case, cover an entire change of the character of the contract and an increase of nearly double the quantities and costs called for by the estimates. Further, if this change, as I contend, was made it could only be legal after full and adequate notice had been given to the contractors of its character. This, as I have attempted to show, ■ was not done, as the survey for the relocation was not cross-sectioned before the work began and only cross-sectioned as it progressed. However, aside from this, as the defendant relies upon the authority of the Secretary to make this change, it must be assumed that he was cognizant of it and that it was made with his authority and that he knew of its character and the very material changes which it made in the volume and character of the work. It is assumed, therefore, that he had full knowledge of this. It must be remembered that, *209 as the Secretary signed the original advertisement and specifications for the letting of the contract for the whole seven schedules under the original survey of Smith, and also , signed the advertisement and specifications, schedules, and estimates for the letting of the contract to the plaintiffs he knew all of the facts and circumstances connected with each of these transactions. In other words, he is visited with knowledge of the character of Smith’s original survey and the incorrect estimate furnished the plaintiffs, and as this survey and these estimates were used in letting the contract to the plaintiffs, he is visited with knowledge of the misrepresentation which inhered therein as to the character and amount of the work, and was necessarily, in ordering a change of this location, a party to the wrong which was done the plaintiffs by that misrepresentation and the subsequent change of location. Having this knowledge of the facts, he will not be permitted to set up his alleged authority under section 25 of the contract and thus protect himself against his OAvn wrong.
To understand the defendant’s evidence in this case the estimates of Smith’s original survey must be borne in mind. It was known that under these estimates the work could not be done within the limits of available funds. Therefore, as Ross states, Bond was instructed in making this location “ to shorten the line and save material ” and “ avoid increasing the cost of the construction of the canal, the purpose being to get it within available funds.” It may be mentioned here as an interesting fact that this canal as originally designed was intended to be 70 feet wide at the bottom. For the purpose of this construction it was decreased to 40 feet at the bottom. Two years after it was completed the bottom was widened to the original 70 feet. The effect of Bond’s survey in this matter of reducing the amount of excavation was to reduce the estimated amount of excavation in Smith’s original survey from 1,399,800 cubic yards to 873,923 cubic yards. According to Smith’s original survey — and it must still be borne in mind that his profiles and cross sections were in the engineer office for reference by this contractor, as representing the estimates and the schedules under his contract, being the data to which he was given reference in *210 making his bid — this was a balanced canal, and, in effect, a plow and scraper job. More than 80 per cent of the materials shown in Smith’s estimates were in class 1, which was admittedly plow and scraper work. The amount of stonework, class 4, was only 25,000 cubic yards, being not quite 2 per cent of the amount of materials. The overhaul is shown to be only 81,248 cubic yards, and the free haul between 100 and 200 feet, 59,039 cubic yards. The depth of the canal was shown to be a foot deeper than in the relocation. By the estimates attached to the advertisement under which this contract was let it was fair to infer that this was also a balanced canal and no mention was made of either overhaul or free haul, and to an engineer the fail-assumption was that both of these were negligible, as it is always customary' to name them where they exist in any ■quantities. The amount of stonework was named as only ‘6,000 cubic yards. So that on the basis of either Smith’s original estimates or the misrepresented estimates of the schedules attached to the contract, the plaintiffs had a right to conclude that it was a plow and scraper job, with practically no overhaul and free haul, very little stonework, and a balanced canal. All of which facts must have been apparent to the supervising engineer, Boss, who had charge' of the matter, if he was approximately as competent as the defendant attempts to show that he was. It could not well have been otherwise, for he had had this whole matter of constructing the canal under consideration almost a year, and had had Smith’s estimates under his original survey before him for more than five months, and had full knowledge of the misrepresentations contained in the schedules under this contract because the estimates had been on three occasions cut down by Smith by his orders until nothing was left but the upper bank of the canal. It will be seen from this how the plaintiffs were led into this contract by deliberate misrepresentation of the volume and character of the work.
Now, look at the situation after the contract had been executed with this misrepresentation inhering in it by the change of location. The contract was hardly signed when within a space of 10 days, or probably sooner, Engineer Bond *211 was sent upon this work to make, not a “ final location ” in the true sense of that expression, but a location which would materially cut down the cost and lessen the volume of material from that shown in Smith’s original survey. It did not seem to occur to them that having induced the contractors by misrepresentations to enter into the contract that he was entitled to any consideration or any notice. As stated above, he came accidentally upon Bond while making the survey, and the only information he got from Bond to put him on notice was that Bond was making the “ final location,” which, as stated, meant to an engineer nothing more than making slight changes. Now, what was the effect of this relocation, for relocation it was, deliberately made for the purpose of cutting down the cost so as to get it within the available funds and to justify the conduct of the Reclamation Bureau in letting this contract and to prevent it from being charged with the violation of the statute for letting the contract for which funds were not available ?
By this relocation, as it turned out, the estimates under Smith’s original survey were decreased from a total of 1,-839,800 cubic yards to 873,'923 cubic yards, but were increased over the estimates furnished the plaintiff for his bid 290,923 cubic yards, the estimate for his bid being 583,000 cubic yards. The amount of overhaul was increased from 81,248 cubic yards under Smith’s original survey, and from being negligible under the estimates of the schedules of the plaintiff’s contract, to 497,688 cubic yards. The amount of free haul between 100 and 200 feet was increased from 59,039 cubic yards under Smith’s original survey, and from being negligible under the schedules of the plaintiffs’ contract between 100 and 200 feet, to 213,704 cubic yards. It might be said in passing that it is shown that a contractor, in making his estimates, expects to lose money on the overhaul and free haul. The amount of stone, class 4, was increased from the estimate under Smith’s original survey from 25,000 cubic yards, and from 6,000 cubic yards under the schedules of the plaintiffs’ contract to 60,000 cubic yards. The depth of the canal was decreased 1 foot, which increased the cost of getting out this rock, class 4, at a low estimate, 15 per cent. *212 So it can readily be seen what was the effect to these contractors of the increase in volume of this stonework of 1,000 per cent and the increase of 15 per cent in the cost of removing it. Secretary Garfield admits that the contractors were “ justified in accepting the figures of the United States as being approximately correct,” and “that the increase over the quantities estimated is to an extent which can not be held to be a reasonable one.”
I am attaching hereto the elements of damages which I think should be allowed to the plaintiffs in addition to those which are allowed by the opinion of the court. These, it will readily be seen, if there was a breach of the contract by the change of location without a waiver of it by the contractor, are losses which necessarily grow out of this breach. The items of interest therein mentioned are inserted as elements of damages. I believe the amounts are established by the evidence. These items are as follows:
Loss on overhaul- $7, 287.60
Loss on free haul- 2,319. 98
Loss by decrease in depth of canal-- 21, 099.31
Interest and depreciation on extra equipment_ 2, 050. 00
Loss on classification- 64,322. 57
In addition to these items I think there should be allowed the following:
Extra premium on bonds during period of suspension of
work_ 1,890.60
Interest on $22,558.98, amount due on the June estimate,
from January 14,1909, to July 1, 1912- 4, 737. 38
Reducing height of banks- 1, 000.00
Total_ 104, 707.44
Amount fixed by the court-1- 60,228. 91
154,936. 35
I am of the opinion that this sum of $154,936.35 is the amount that the plaintiffs should be allowed to recover in this case as damages.
Before concluding I desire to notice one or two positions taken in the majority opinion.
Before proceeding to do so, it is proper to call attention to the following principle laid down by this court in the case of Christie v. United, States, 51 C. Cls., 18-22; 237 U. S., 234, 240:
*213 “ We might also add that we can not see any force in the contention that a party can claim exemption from liability for damages in the performance of a contract arising from his deception on the ground that such damages were aggravated by his own unreasonable conduct in the performance of his part of the same contract.”
Without extending the discussion, the principle laid down in the above quotation precludes the defendant from relying, as is done in the opinion of the court, upon the following provisions of the contract:
Paragraph 12, which provides that bidders must satisfy themselves as to the nature of material and as to local conditions affecting the work, etc.
Paragraph 24, which is to the effect that the quantities given in the proposal are for the purpose of comparing bids, and are approximate only, and no claim shall be made against the United States on account of any excess or deficiency, absolute or relative, in the same.
Paragraph 25, which is to the effect that the Secretary of the Interior reserves the right to make changes in the work and materials, and that bidders must make their estimates accordingly.
And paragraph 8, making the decision of the chief engineer binding on both parties on all questions concerning the execution of the work, classification of material in accordance with the specifications, and determination of cost.
It will readily be seen without an extended discussion, that if there was a breach of this contract by misrepresentation of the estimates and survey or by a material and unreasonable change in the volume and character of the work by the relocation of the line, without notice to the plaintiffs, the defendant is estopped from pleading these provisions of the contract by way of defense and excuse. The defendant can not induce a person to enter into a contract by misrepresentation and afterwards make material changes in the amount and character of the work, without notice, and then shield itself behind any or all of the provisions above mentioned of the contract. To do so would be to enable it to occupy the inconsistent and conflicting position of breaching the contract and then protecting itself against the breach *214 by the provisions of the contract. If what the opinion of the court seems to contend for is true, all that is necessary to entrap the unwary and successfully reap the fruits of a wrong is to insert in the contract such provisions as are above referred to, which, if upheld, will leave the wronged party without redress. The principle that a party can not take advantage of his own wrong and plead for his protection the provisions of a contract which he has violated is too elementary to require quotation of authorities. The Government after wronging this man by misrepresentation and by changing the character of the work under the contract without notice will not be allowed to plead the provisions of that contract to shield it from the effects of its wrongdoing.
It may be well to say a word as to the question of classification involved here in the above-mentioned provision of the contract with regard to the engineer’s decision thereon being final. It will be recalled that when the estimates under this original Smith survey were indiscriminately reduced to meet the funds available for the construction of this canal, the classification of the Smith survey was destroyed. By the relocation, the whole character of the classification under said Smith survey was changed. The classifications given in the plaintiffs’ contract were based upon pure guesswork and amounted to no classification at all.
These acts so changed the whole question and situation as to classification and so breached the contract as to classification as to prevent the defendant from pleading the power of the chief engineer under the contract to control this matter, as a ground of defense and as a means of extricating the Government from the situation produced by the effect of its own wrong. Again this decision of the chief engineer can not correctly be said to have been based upon any definite or reliable information. He was only on the work, according to his own statement, three times — in the spring, summer, and fall of 1901. He did not make his first visit until after the board of engineers had passed upon the classification theretofore made, and had held that it was not only incorrectly made, but that it was made without even the proper attention to it by the supervising engineer Boss, and others in authority over the man Fisher, who made it. This board *215 of engineers was only appointed by the Secretary of the Interior after more than six months of complaint by the plaintiffs of the incorrect and unfair classification, both as to kind and amount, and after these protests had been made to the supervising engineer; after the plaintiff had gone to the expense of a personal visit and protest to the Secretary of the Interior at Washington. The report substantially confirmed his complaints. It found that the classification had been left almost entirely to an engineer by the name of Fisher, who was not even carried on the Government roll as an engineer, and who, as a matter of fact, was not a graduate engineer, and that his work had not been properly supervised by those above him, including the supervising engineer, under whom he directly came, recommending that a competent and experienced man be given him to assist him in the work, and directing that the work heretofore done by him be reclassified. Now, note what occurred. The experienced and capable man, who was furnished to assist in this and further classifications, was a man who had had no experience in classification, was not a graduate engineer, and, as a matter of fact, took no part in the classification. Fisher, with another engineer, were selected to do the reclassification. Fisher was selected to review his own errors and mistakes. In view of the fact that he had made this first erroneous classification in the face of the repeated protests of the plaintiffs which were found to be justified by this board, it is not difficult to conclude in advance what he would do when he came to review his own action. These two took 203 days to do this whole work of reclassification of about nine months of excavation. Much of it required the opening and digging of test holes. The evidence shows that this whole classification, in the final analysis, of the work was done by Fisher. He received, after the report of the board, no more supervision from those above him than he did before the examination and report of the board, and for which want of supervision the board censured Engineer Horn, who was assigned to this supervision. Fisher stated that he did not agree with the conclusion of the board, and was not convinced by this report that he was wrong in the first instance. He did a good part of his classification, not *216 according to the classification fixed by the specifications, but according to what was called the Government “ standard classification,” which was different.
He lived 5 miles from the work, usually got there late in the morning after the blasting of the rock of the night before had been covered up by the additional excavations made in the early hours of the day, and very often did not visit the work for days at a time. The character of his classification and his estimates are found to have been wrong, both as to amount and kind, by a board of four capable engineers, asked by the plaintiffs to go over the work with a view to reporting on the classification. This engineer Fisher is the person who furnished the facts to the effect that the plaintiffs were not properly progressing with their work, upon which the defendant based its action in abrogating this contract, which action, the opinion of the court has found, was based upon a false statement of facts, namely, the facts furnished by this engineer Fisher. This last untruthful statement of his, which caused a breach of this contract by the Government, the repudiation of his work by the board of engineers — competent men — -selected by the plaintiffs, his want-of equipment and experience as an engineer in such work, all go to render his work and his statements unworthy of reliance. And as the supervising engineer, who knew little or nothing of this matter of classification, intrusted it to Fisher, it will be violating every principle of reasonable and fair dealing if the plaintiffs were wronged by this classification, to allow the Government to escape from the injury by reliance upon the statements and work of Fisher. If this conclusion be correct, it would be clearly wrong to allow the Government to protect itself against its wrongful acts by relying on the power of the chief engineer as to classification, when the classification was wrong and the engineer himself had a most imperfect and no adequate knowledge- of what was being done about it, except as reported to him by his subordinates, who, as stated, had intrusted the matter almost exclusively to Fisher. It is not shown that there was any independent action of an engineer officer in responsible charge having finally passed upon the classification of materials, but that the action all through was that of Fisher. The *217 four engineers selected by the plaintiffs, all competent and experience men, one of whom is praised- in the highest terms by the supervising engineer Boss, spent a month on this work and submitted a report, to the plaintiffs showing what, in their opinion, the plaintiffs were entitled to receive as a result of their classification of materials. Under their estimate the plaintiff would be entitled to receive on both schedules the sum of $312,583.12. The plaintiffs received from the defendant the sum of $248,261.07, leaving a balance due, according to the estimates of the plaintiff’s engineers, of $64,-322.08, which amount I have included in the foregoing estimate of what, in my opinion, should be allowed the plaintiffs in this case.
It is proper, before concluding this branch of the case, to call attention to the fact that no trouble was experienced in the matter of classification for the first two or three months when Engineer Bond was in charge of the work. Pie was succeeded by Engineer Fisher, and from that time the plaintiffs were constantly complaining of their treatment by Fisher and eventually by .Boss and those above him in not heeding their complaints against Fisher, which the Government board of engineers found were justified.
In conclusion it is, I think, proper to call attention to the fact that the plaintiff, Page, died before he could testify, and the Government’s witnesses who had dealings with him and who testified in this case knew that there was no danger of their statements being controverted by him. As his complaints made as the work progressed, and the charges in this suit, reflect severely upon their inattention to their work and their prejudice and incapacity in some instances, I think that their testimony should be taken with some grain of allowance in view of the fact that they themselves and their professional records were in a sense on trial. In many important particulars it is plainly to be seen that the presentation of the plaintiffs’ case was much embarrassed by the want of Page’s testimonjf, and also, it may be presumed, of the benefit of his advice and knowledge in examining these Government witnesses and in meeting their statements.
I am convinced from a full and careful examination in •detail of the record in this case, that the plaintiffs from its *218 inception received unjust, unfair, and prejudiced treatment. The record reflects no credit upon the responsible officials of higher grades under whom this work was done. The higher officials were negligent and inattentive, intrusting to incompetent and careless subordinates duties which statute and the contract placed independently upon them, with results calculated to discredit the Government by subjecting it to the charge of unfairness and injustice — a serious delinquency, aside from the particular injury done the plaintiffs.